in BMG v. Cox Communications, whenever the lawyers are ready. May it please the Court, Michael Elkin here for Cox, good morning. Good morning. Well, I'm happy to take any questions concerning any of the arguments. Oh, you'll get them. In our brief. You'll get them. I thought you were going to say, but I'd like to give my argument first and then answer questions. We don't let that happen. That was a unique way of starting out. I haven't heard anyone do that. You see, we think you've made your argument in your briefs. Have you made your argument in your briefs? I think I have, Your Honor. Okay. I'm just going to focus on. You can just sit down then. If you feel comfortable with that, we won't ask you anything. He's just trying to tell us where he's going to focus. Well, if I knew how the decision was going to be written, I might take you up on that. But what I'd like to do, if I'm permitted, is to focus on why the district court failed to properly permit the jury to find contributory liability on the right standard. Our argument, as the court knows, is that the judge permitted the jury to find contributory copyright infringement liability on a constructive knowledge standard. And if time also permitted, I'd like to try to address the safe harbor issue as it relates to the post-2002 period in terms of whether or not the jury should have heard evidence on whether Cox failed to terminate repeat infringers in appropriate circumstances. I see you think there's a difference between what you think your most important argument is and what you think your strongest argument is. Which do you think of those two as your strongest arguments? The infringer question or the contributory? I think the contributory infringer would be the easier one, Judge Shedd, because number one, you don't even need. Which is it? The contributory, the Sony bar, because you don't even need to get to the repeat infringer if the court were to find that the judgment should be reversed and entered in Cox's favor. As we had asked for in summary judgment. It seems to me you have a pretty good argument, a statutory argument, on the infringer question. Do you agree with that? Statutory language on what an infringer is. We think we do. We do. But it seems to me when the contributory argument, you move beyond the statute, don't you? On the contributory one, we think that... There's no statutory language that says if you look at that statute and read that statute this way, the most obvious way, we cannot be a contributory factor. In fact, that's exactly, Judge Shedd, what the Supreme Court held in Sony. Sony basically said the copyright law doesn't have secondary liability. It doesn't have contributory and vicarious liability. And the court should tread very, very cautiously with respect to expanding a liability beyond direct infringement. And in fact, as the court well knows in Sony, the court found that, at least as it related to the Betamax video cassette recorder, that where a product is capable of substantial non-infringing uses, one can't find contributory copyright liability based on the generalized knowledge that the product could be used for infringing purposes. Under general law or under statutory law? Under two interpretations of the United States Supreme Court. As to statutory law or as to general law? Didn't the court look at general law there, too? The only statutory framework with regard to... Is that a difficult question to answer, what I'm asking you? Did the Supreme Court in those cases look to more than a statute? It looked to the statutory law and applied common law principles. Right. So it looked to law beyond the statute. I... My point is, do you need to even do that on your infringement article argument? Or do you just go... It doesn't say accused or thought to be infringer, but it says infringer, and that has to be actual infringer. You don't... That's not your argument? Your Honor, our argument is simply that if you're going to have a contributory infringement theory, you have to have actual... material contribution. We believe the district court here permitted the jury to find contributory liability based on a should-have-known standard, and that flies against 30 years of jurisprudence to the contrary. I'm not asking you to make your argument on that point. I was asking why you thought the contributory issue was an easier argument for you to make than the infringer issue. But you can make your argument any way you want to. I've taken a bunch of your time not letting you do what you want to do. No, I appreciate that. Another reason why we would have that is... Let me ask you, at least structurally, on how your argument is going. You mentioned the statutory law. What statutes are you referring to? Well, I think what Judge Ed was asking... I want to ask you, what statutes are you talking about? Well, the only statute that applies with regard to the contributory infringement is the copyright statute itself. What's being alleged are certain violations under Section 106 of a copyright statute. Is that the DMCA you're talking about? Sorry? Is that the DMCA? No, no. I'm not referring to the DMCA. I'm just referring to the contributory Sony standard. If I have time, I'll get to the DMCA. When you started out, you said there are two things I want to focus on. Thank you. And I thought that one of them was the DMCA, but I was wrong about that. I was going to touch on that at the end. My primary argument today, as I was trying to articulate at the beginning, was I wanted to address why the district court... Jury instruction was incorrect with respect to contributory infringement. Is that right? You're correct. We believe there are two dispositive facts that are just critical here. They're very simple facts that I don't think are in dispute at all. Number one, Cox, in providing broadband to its customers, doesn't store any content. It doesn't host any content. It can't locate any content. It can't access content. It acts like a telephone service in terms of it being a conduit. Fact number two, Cox never received any notification of BMG Infringing Works at all. The only notifications of the BMG Infringing Works came in the form of Rights Corp notices that had long been blocked for reasons having to do with violations of Cox's policies. Cox had notified Rights Corp that it could modify its notices, and it elected not to do so. All of that evidence is in front of the jury, right? All of that evidence is before the jury. All of their evidence about your procedures is also in front of the jury. I'm not sure where you get with on those facts. I thought you were making a legal argument about the jury instructions. What's wrong with the jury instructions? Well, the issue, frankly, is what's right with the jury instructions. I need to know what's wrong. Number one, the contributory liability. What's the term in there that's the problem? Sure. I'll be happy to take your honor through that. If you take a look, it's instruction number 26. I want you to focus on material contribution. Right. That's actually not something that we even have to get to. If I may, because if you take a look at instruction number 26, it says, with certain exceptions, a person is liable for copyright infringement by another if the person knows or should have known of the infringing activity. And therein lies the problem. That should-have-known standard flies in the face of Sony and Grokster and, frankly, pronouncements across the country in an online context. And it not only has grave consequences, the district court, frankly, didn't even address it. So you want us to take the Ninth Circuit standard on this? Well, the Ninth Circuit standard, frankly, is in terms of, it requires at a minimum a perfect 10 versus Amazon. It says that you have to have actual knowledge of specific infringements, material contribution, and simple measures that could be taken. There's no question here. Your answer to his question is what, yes or no? He asked you a question. He didn't ask you to say what the Ninth Circuit decision was. He asked you if you wanted us to follow their standard. And your answer would be yes or no and then explain it. I think that if you could, yes, I think if you follow that standard, you would find at a minimum that these instructions were incorrect. That's correct. Because? Because, number one, the instruction did not provide for actual knowledge of specific infringing events. It provided for should have known, which is a constructive knowledge. E-mails all floating back and forth within COPS has e-mails going back saying all these things are there, which shows they know these repeat offenders are out there, and they deliberately do nothing, or they indicate we are not going to do anything. These are your e-mails. And the fact you got those e-mails, that's not sufficient. What do you need for actual knowledge? Judge Wynn, the record is completely, goes in the opposite direction of the predicate of your question. Let me make sure I give you the premise. There were e-mails, and those e-mails say just what I said, don't they? No, it had absolutely nothing to do with BMG infringing works. All of the infringing works. But they had to do with your policy? Had to do with your policy in terms of how you would deal with these kinds of situations when you get, even if the notices are insufficient coming from Wright Court and the others, even if those are insufficient, you've got e-mails in your company going back and forth telling what you are doing. And that cannot be knowledge sufficient? No, Your Honor, because not one of them referenced a BMG infringing work. Not one of them. Now, the issue in terms of Cox's policy. But they were talking about the general abuse department in terms of, well, we get these things, we might get, this is what we're going to do with them because we don't want to lose customers. I mean, isn't that what's here? I mean, it's the same thing. I'm not going to stand up before this Court and tout the communications. But I will. And do what? I don't understand that statement at all. I don't understand what you said, literally. What I would say, Your Honor, doesn't. Wait, wait, wait. What did you say? She asked you a question. I'm not going to stand up in front of this Court and. Oh, I'm sorry. I'm not going to sit here and stand up before you. Wait, wait, wait, wait, wait. Just tell me what you said. Listen, just let me say this. When a judge speaks, you have to be quiet. I think I heard you. I'm not sure. Okay. But what I think Judge Motz missed and wanted to ask you about, but you wouldn't pay attention to her because you kept talking, I think you said, I'm not going to stand here and tout the communications. Did I hear that? Tout the communications. Right. Is that what you said? Yes. Thank you. The issue, frankly, two things, if I may, Judge Winn. Number one, there is nothing that requires Cox to take affirmative actions. Brockster makes that very clear. You don't have to take affirmative actions in order to receive the benefits of the Sony bar. Your time is going to be up in a minute, but I want to say this, because I see where you're going with this. That's a very muddled area you're walking in. But I pointed you to something in that instruction on material contribution. The jury specifically asked for a definition. The judge didn't give them anything. And I, for one, do not understand why you wouldn't focus on that as opposed to trying to get us to establish something. I don't know where we're going to go when we're dealing with all these other terms that are there because you know this is around the board. You've got people on all sides. You've even got amicus briefing here telling us nothing. They basically are just telling us, well, there's a lot of problems. In court, what are you going to do about it? When we've got a statute that we're dealing with and we're dealing with all these other issues here, and this thing is all on board, and this is not Sony, we know that. This is an Internet service provider. This is not equipment that's being used in this type of way. It's not the same type of case, and we've got the subsequent case. We know that we've got to make a decision here, and you're asking us to develop a standard without telling us what to do, but the Ninth Circuit seems to me to go too far. How do you require actual knowledge when you've got this right on that part of it? But your argument, I don't know why you don't focus on something that looks like to me is pretty clear. Well, we do have issues with respect to the material contribution that are set out in our brief, but I do want to attack the issue that you've just raised, if I may. Which one? You go ahead and do that, but I just focused you on something that I thought was pretty interesting, but go ahead. Number one, I don't think that the Amazon versus Perfect Kin, frankly, is a broad view of Sony. I think, frankly, the fact that it would require additional measures, if that were appropriate, which doesn't exist here, would actually be a higher standard. But no matter how you look at it, whether it's Sony or Grokster, this service is capable, as the district court recognized, for an untold number of legitimate uses. And the record is bereft of any evidence at all that Cox ever received or reviewed any notifications of any BMG infringements. In those circumstances, the contributory liability . . . So you had no idea anybody was saying you were doing anything wrong. No. You had no idea. All those notices, they meant nothing, they mean nothing to us. What do you make of that? All those notices that Judge Wins asked you about, what about that? Your Honor, I . . . Are they just those notices that, in your view, are deficient or insufficient? No, Your Honor. I think that if you're making reference to the communications with Cox . . . Yeah, we know what we're talking about. I'm asking. Yeah, that's right. What do you make of that? I think that I can't sit here and say it was Cox's finest hour. I didn't ask you to say, for you to describe what your client did. I asked what do you make of those. You know, may I say something? I understand you think you're really prepared and you have a good argument. But we've heard a bunch of questions from judges on things that we think are important. And for some reason, you choose not to want to talk about that. I'm not quite sure why that's so. But just answer this. Your time's run. I think you reserved some. Would you just answer for me, do you think all those notices that were coming to Cox, they mean nothing? And if they mean nothing, it's because they are deficient? They mean nothing? Or do they mean something in this case? Of course they mean something, Your Honor. Well, then what is it? What do they mean to you in this case? Number one, to the extent that I think a jury should be in a position to determine whether or not those notices themselves . . . That might be clearer to you. Well, with respect to . . . The answer would be what? With respect to Sony, there's nothing because if you adopt the reading of Sony Grokster, a fair reading, those notices wouldn't matter because it doesn't reference any BMG infringed works. I didn't have a chance to address willful blindness. Maybe I will later. But with regard to the DMCA, the jury could have determined that Cox blew its safe harbor. But that was a jury determination that the judge did not permit the jury to make because he decided it on summary judgment. I was asking about notice of infringement, not about the safe harbor. Your position is those notices to you, to your client, of course, I mean. Sure. They mean nothing. They have no evidentiary value whatsoever. I'm not saying that, Judge, yet. Then this is my question. Then do they have some value in this case? Are they relevant? They are relevant to certain aspects of the case. As to contributory infringement. Relevant? The answer is no. Okay. Okay. Thank you. So, can I ask you before you sit down, you're trying to get your argument out that there isn't evidence here of contributory infringement. That the jury instruction with regard to contributory infringement was wrong. That there has to be actual knowledge. How would you ever demonstrate that? Well, number one, you don't even need to get there. If you take a look at the. We are there now. I think there are cases, Your Honor. I'm thinking of the Netcom case, for example, that was decided in the Ninth Circuit. Where you had an online service provider that also stores in addition to acting as a network. There are circumstances in which an online company would be in a position to be able to have actual knowledge. But the facts and the record here just don't support it. All right. What about willful blindness? Willful blindness. That, of course, that still would preserve your argument that the jury instruction here is wrong. But don't you have to concede in light of Supreme Court law that there could be a claim based on willful blindness? Yes. There are two issues with that, if I'll be very brief. Number one, the instruction that the district court gave was wrong with respect to that. Because he had a watered down instruction with respect to the level of awareness and intent. The Global Tech case, we believe, is on point as well as the Loved Arts case in the Ninth Circuit. But specifically, what you'd have to look at in terms of willful blindness, the jury was given two instructions. It was given the willful blindness instruction. It was also given the knowledge instruction on contributory liability. We don't know at the end of the day, Judge, what the jury did. No, I understand that. And so the jury could well have decided on contributory as opposed to willful blindness. And because the instruction was wrong, at a minimum, we think it should be set back. And I thought my question took that into account. And so you still have your claim about the inadequacy of the jury instruction with respect to the infringer. But it doesn't seem to me that you have a claim or you have a consistent argument that actual intent is required. It's that I think willful blindness would do the trick, that I think that's what the courts say. Now, you can say the evidence here doesn't demonstrate willful blindness. Well, I think the standard is laid out in Global Tech. A willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts. Right. I think the judge's instruction, if anything, was hybrid between a negligence and a recklessness standard. I think it falls short. We're not communicating here. So I appreciate your argument, but you keep slipping back to your other argument. And what I'm saying to you is, suppose you're right on that, but we are here on appeal and we're looking at all of these instructions. And so what I'm asking you is, independent of your main argument that you're focusing on, what's wrong with the willful blindness argument? The willful blindness argument, number one, has the wrong standard. It basically has, and so you don't even need to get there. There is willful blindness, but not the willful blindness in which the jury was instructed. The jury was instructed on the wrong standard. We believe that that standard is not consistent with Global Tech. The Supreme Court decided. All right. Thank you. Thank you. Your time has expired. Long since expired. I'll give you some extra time, too. And maybe ask the clerk to give you the same amount of time. Go ahead. May it please the Court. Good morning. Michael Allen from BMG in Round Hill. Your Honors, Cox was found liable in this case under longstanding principles of common law, tort law, on which the jury was accurately instructed. Cox willfully blinded itself from millions of notices of specific acts of infringements happening on its network. Even worse, Cox created an environment that safeguarded habitual abusers, so long as Cox made more money from those subscribers than it cost them. This was all part of Cox's scheme to allow infringement, but at the same time immunize itself from liability. That's why the jury correctly found Cox willfully liable in this case, and that's why the judgment should be affirmed. Let me turn to the elements of contributory cause of action, starting with the knowledge standard. The elements of contributory liability, going back 50-plus years to Gershwin, is knew or should have known the infringing activity and cause, induce, or materially contribute to that infringing activity. We talked a lot about notices a moment ago. Let me just explain. In Grokster, Grokster, is that how you say it? Yes. Help me. The Supreme Court said that one infringes contributorily by intentionally inducing or encouraging direct infringement. So how does the jury instruction square with that, should have known instruction? The Grokster case was an offshoot of Sony. Basically, what the court was faced with Grokster was a Sony-type situation with clear evidence of actual inducement. The entire premise of Grokster is discussing the actual inducement evidence that made a Sony-type situation liable. Grokster did not overturn traditional standards of contributory infringement liability law, Judge Moss. In fact, they endorsed the Gershwin decision in the majority opinion. In every case, frankly, that's discussed contributory infringement in the copyright setting before and after Grokster has discussed Gershwin. No case has. I'm particularly wanting you to focus on the should have known instruction. Sure. Happy to do that, Your Honor. Knowledge is the first element of the contributory infringement standard. Under the common law, knowledge is an objective standard. And this Court in the Starnes case, the Second Circuit in Arista v. Doe, the Ninth Circuit in Napster, the Eleventh Circuit in Cable Home, and Casella v. Morris, as well as the Seventh, Ninth, and Eleventh Circuits pattern jury instructions on contributory liability, all recognize that should have known is an appropriate standard when you're dealing with knowledge under the common law. Right. That there's chargeability with knowledge in certain circumstances. There's nothing that changes that aspect here. Nothing from Sony, nothing from Grokster, nothing in any piece of the law. The thing that's different that I think is recognized in the Supreme Court cases is that there is a lawful ability to do what's being done. And that makes the should have standard more difficult to apply. And the way I read Grokster, it says one infringes contributory by intentionally inducing or encouraging direct infringement, which seems to me to suggest that the should have known standard does not apply. Well, let me see if I can unpack that a bit for you, Your Honor. Looking back at Sony, okay, which is where you have to sort of look at both of them in tandem. Instead of editorializing about everything,  Very good. I will, Judge Shedd. Sony involved a case where a product was created, put in marketplace. The only relationship between the manufacturer and the buyer of that product occurred at the point of sale. It began and ended at the point of sale. And the only theory on which that manufacturer could be held liable was that somebody, some point down the road, maybe might infringe somebody's copyright. That generalized knowledge, the Supreme Court correctly held, was not enough to make that manufacturer liable. Because of no ongoing relationship. In part, in part, yeah. Why don't they send updates on the machine? Why don't they send updates on the machine, which helped its capacity to do everything it could possibly do? Well, the updates on the machine argument, Your Honor, is light years far from where we are in this case. But I just asked you to answer it. The updates would not create liability. Simply sending an update or... So the ongoing relationship doesn't really matter much in your assessment? Well, I think you have to assess the materiality of the ongoing relationship, the significance of it. If somebody sends an update... What about, you have an IPS here that doesn't store anything or do anything or view what anybody's doing, just basically a highway to be able to be involved in life's activities? Well, it's a bit more than a highway to be involved in life's activities. And Congress recognized that when it enacted the DMCA. It recognized that ISPs like Cox could be held liable under traditional notions of contributory liability, as the jury found here. There's no doubt that an IPS like Cox, I think, under any standard, could be under the appropriate facts. Could be under the appropriate facts. What if an ISP sent out a notice to his users going, by the way, if you want to get copyright material, we won't store it for you. But if you want to use copyright material, we'll look the other way while you do X, Y, and Z. An ISP like this could be held liable. Exactly. But we have to look at what the virtue is of an ISP, which doesn't do anything, maybe anything that ISPs did when Congress passed the most recent legislation. Well, we have to be, in this case, looking at Cox. Cox is an ISP, but Cox desperately wants you to think of them as a general good corporate citizen ISP. Not that. What about a good ISP that only does ISP more? What do they do beyond that that makes you think there's an ongoing relationship, which relationship infringes? Well, Cox and the ISPs are gatekeepers. They are the only ones who know the identity of the infringing subscribers. That doesn't mean that they did anything to help them in the act of infringing. No, but if they took steps like Cox did here, which is intentionally configure a system to block notices, enable habitual abusers, like the emails you mentioned, Judge Wynn, that are talking about people who have been doing this for years and have the audacity to say they're upset that they're getting caught, habitual abusers who've made it through, Cox configured their system to ignore 95% of these notices. So 5% trickle through. And of the 5% that trickle through, and they get 13, 14, 15 steps in the system, Cox has sent them notices, talked to them. It doesn't matter. We can get hung up on evidentiary matters here. We can dive into these terms. But I want to go back to a question I asked your opposing counsel. I'm not sure he even appreciated or wanted to go this way, but I'm kind of interested to know because I think there's a question regarding whether the trial judge effectively instructed the jury regarding the effect of Sony in the Groster cases. The jury asked them specifically to define material contribution. And the trial court didn't do so. No, Your Honor. That's a problem because that definition is squarely right there in the Sony Groster case. It tells it right there what material, what contribution to be material goes on and tell what it is. It would have been tremendously helpful to the jury to know what that connectivity is. That wasn't done. He just didn't give them instructions. The jury asked them. Well, you've got to step back and, A, Sony was not a material contribution case. Sony really only dealt with knowledge. Tell me about this material contribution because that is the connectivity and the language comes directly from the case there. Whether it's Groster or Sony. The Groster has it right there and it says for a contribution to be material and it goes and states what it has to be. Why is that not something that would be helpful for a jury rather than given this term and they ask you what does it mean, you just go ahead on back or whatever. Well, Groster was an inducement case, not a material contribution case, and Sony was a knowledge case, not a material contribution case. Is this a material contribution case? We presented evidence and the jury found. Is this language helpful in a case like this for a contribution to be material? A contribution must be substantial to the infringement. Regardless of what those cases were, would that definition be helpful to a jury? Well, the term material. Especially when it goes on to say relevant considerations include relationship between the parties, the defendant's state of mind, amount, duration, and type of assistance. This is a jury asking a simple question. What is this material contribution? Well, both parties submitted competing. I'm not asking you about what those cases were about or trying to pin it to those cases. I'm talking about this case is a material contribution, and there's a definition of it right there. It seems to be very readily understandable. Yes, Your Honor. Material contribution, I think, on its own is very readily understandable. Material is significant. It is not inconsequential. What if the jury comes and asks you what it is and you say nothing? Well, this Court is held in the Bund case and a number of cases that judges are well within their discretion to set up the instructions as they see fit. If the Supreme Court took time to come out and says for a contribution to be material, why would you do that? Just say material contribution. Well, look, the evidence in this case shows ample evidence that Cox participated in this activity. They intentionally set up a process to implement a filtration system that allowed it to ignore reams of notices. They created anonymity for their subscribers. But you're answering the question of why, under one scenario, the jury verdict could be upheld. But Judge Wynn's question is when the jury could sense it wasn't defined for them, they may have hinged their decision on something that's outside the realm. You're presenting a direct verdict case. You're saying the evidence only means this. But if there's conflicting evidence in the instruction, the jury could go either way. My question goes to this jury instruction, and that is, was the jury properly instructed? To get there, there's a whole lot of issues you don't even reach in this case. Well, I think the jury was absolutely properly instructed, Your Honor. That's why I asked you about the material contribution instruction, that he did not say a word about. And there's a definition. He says it means, everybody knows what it means. Well, if that's so, then the Supreme Court wouldn't have said this and actually defined it. Well, again, the Supreme Court didn't define contribution. The Supreme Court defined inducement. The Supreme Court defined inducement. Remember, the elements are knowledge plus cause, induce, or materially contribute. There's a number of cases that discuss material contribution, and I'm not aware of any of them where the term was actually defined for a jury. How about the restatement of torts? I don't know the restatement of torts on the concept of material contribution, Your Honor. I do know there is a definition there within the restatement of torts. I'm not aware of a specific definition of it in that restatement, Your Honor, but I do know that the pattern jury instructions in the 7th, 9th, and 11th don't define, don't have a definition of material contribution. And I think that given all of the evidence that was presented in the case, the judge did not commit clear error or provide some erroneous instruction by not defining a term. Well, that wouldn't be clear error on a jury charge, would it? That's not clear error. On a charge on what the law is, that's not clear error. Well, I don't think the judge provided an erroneous instruction whatsoever, Your Honor. The other side asked for an instruction. The other side did ask for an instruction. And was that a correct instruction? Absolutely not. A completely incorrect instruction as a matter of law. Had the judge provided the instruction or the definition of material contribution that Cox proposed, that would have been an erroneous instruction. Did you offer a counter instruction? We did, Your Honor, yes. And the judge refused to give it as well. The judge did not give that instruction either. He thought that this term was obvious. But then, as my colleague says, the jury comes back and asks for help. And I assume there's more discussion from the lawyers with the judge. Correct. When the jury came back, the judge heard discussion on this. There was some argument on it. And both parties presented their case. And the judge felt, in his discretion, that the term was obvious enough, given the way the case was put together, all the evidence that was put in the case. And he asked them to use their ordinary definition of two terms that have ordinary meanings to everyone. Getting back to the knowledge point really quickly, Your Honor, I do want to make the point that it's not just the notices. You can't get from notices alone. You're not going to say notices alone do it. No, no, no.  Providing it to them, of course, they would like to have a full adjudication for everything to get there with it. But providing just a notice is not going to do it alone. No. What you have here in addition was those e-mails internally. We had e-mails. We had summary information. We had a dashboard that I want to make sure the court is aware of because I think it's a very important piece of evidence. The notices provided the detailed information about the infringement. The IP address, the date and time of the infringement, the information and so forth. How many of these notices did you give out? 1.8 million, Your Honor, for just the copyrights at issue. What are they going to do with all these notices? Well, we provided them also a dashboard. And it's a searchable website that they can search by most egregious repeat infringer. They can pull up every single piece of information we've ever provided to them. And they can play the actual songs that were downloaded, 150,000 songs. Internet service provider is going to receive 20,000 of these things a day, 1.8 million a year, whatever, time period. And they're going to start playing songs and things like that to see if it's going on. They don't need to investigate, Your Honor. That's where this case is going to go. I mean, you've got the Sony case. You know they didn't go like that. I mean, I got it. But I'm thinking if you want to go to knowledge, it just seems clinging to me that says, Why try to make this thing on? We're giving you all these notices. Let's look what they said internally. There's no question. Because when a person talks back and forth with each other, it tends to let you know what they know. There's no question. But you're just throwing a bunch of notices to them because, you know, we're talking about notices not coming from BMG. This is coming from Wright Court, right? Well, Wright Court on behalf of BMG, Your Honor. Yeah, Wright Court has a different interest in this thing. It's not producing music. It's an enforcing type thing. Well, Wright Court is the agent that detects the infringement, Your Honor. That's right. I mean, call it whatever you want, but it's not BMG. It has a different interest in here. So it's going to throw every notice it got out there. And then it tacks on this little thing when you do it. I mean, I don't understand that settlement thing that was involved in it, but that's a whole different question. Sure. I understand that. But, you know, so I don't know, just throwing notices out, millions of notices out to an ISP, and you say they got knowledge because you think they're going to go and play these songs and check to see if this is what it is? And they say, oh, no, that was background music. Or this was all these other defenses you can come up with. You think that's the way it's going to happen? Your Honor, we provided them the— I think that the entire package, Your Honor, shows that they had knowledge of rampant infringement on their network. The entire package of information that we presented, including, as Your Honor points out, all of the e-mails with the habitual abusers, knowing that they're infringing, and that is the information that the jury used, the creation of this scheme to allow these perpetual habitual abusers that Cox absolutely knew were infringing to continue to infringe. Are you making this argument just on the contributory infringement? Are you making the argument, does it also go to the safe harbor? Well, the facts do overlap between contributory and— Who does your argument go to, both of them? Both of them, Your Honor. I mean, with respect to this, if you'd like me to address the safe harbor, I'm happy to do that. Well, I want you to. Nobody seems to want to, but I want somebody to at some point. But I don't want to cut short any other argument. But I do want to ask you about what you think repeat infringer means in the safe harbor position. Your Honor, if the court were to adopt Cox's proposal— I have what you think it means. It means just as the court in MP3 Toon said, which is somebody that repeatedly infringes copyright. All right, but what does that mean? What does infringe mean there? Multiple times infringing copyright. But how does somebody know a third party is an infringer? Because you say so? In this case, there's ample evidence that Cox knew from the admissions, like Judge Winston. Do the notices alone do it? Your notices to—and by the way, this stuff about BMG. This is your agent notifying Cox of infringements, correct? BMG threw its agent. Correct, Your Honor. All right. So, is there any question on this record? Did Cox not know that whatever—I can't remember the intervening company. Rights Court, Your Honor. Yeah. Is there a real argument that Cox didn't know they were representing BMG's interest? No, because— Well, we heard the other side say that. Nothing about BMG. Nothing about BMG. What do you say about that first? I'm just asking. They're willfully blind to it because they deleted all the notices. They configured their system to block. But their argument, I thought, was we got these emails or these notices, but it had nothing to do with BMG. I thought that's what he was trying to say. Well, what he was saying, Your Honor, is these habitual abusers that Cox communicated with that filtered down through the system. Cox had a number of these folks who admitted to infringement. What about BMG? Those were not BMG. Well, we don't know whether those were subscribers that infringed BMG copyrights because they blocked all of the notices, and they prevented us from locking up, connecting the dots. That puts the next question. The statute requires a repeat infringer, correct? Yes, Your Honor. How is—what is the requirement to be an infringer in that definition? What is an infringer there? What has to be established for a person to be an infringer for purposes of that same harbor language? Certainly. Is that clear to you? It is. It's someone who infringes or violates the exclusive rights in 106. Based on what standard? Are you saying so? This is clear evidence of infringement, Your Honor. This is technology. Well, it is not a question of they might be or it looks like or presumably. It says an infringer. These are files being shared on a BitTorrent platform, which the evidence in the case is— You are making statements as to what they are because that's what you say they are. Cox says that they are infringers if they've been previously adjudicated to be such. Judge Shedd is going to the question of what are you saying is an infringer? And you walk in that notice thing again, and I thought I directed you to say—not directed, indicated— it might be a good idea not to go and see a notice alone from somebody who has an interest of just saying, here's a notice of an infringer to think if you send a million of those out, all of a sudden they've got to do something. When you've got the internal emails back and forth that tells you what they're doing, even if it's— but then the question is, were those notices legit? It's still there. This is a circle of questioning that's going around, but for you to just say they are infringers. Well, yeah, but who said so? That's Judge Shedd's question. Right. Again, these are people who have admitted to infringing. They've told Cox they've been caught. They've admitted to doing it. Cox is looking at them through the system, and Cox would have accepted these notices and had it gone all through their system. These are people—these are Cox customers who say to Cox, yeah, we did. Exactly, Your Honor. We're infringers. Exactly. And if you adopted the repeat adjudicated infringement standard that they proposed, it would go against the text history and the entire purpose of the DMCA. Congress envisioned that parties would work together here. Think about the— Can I tell you something? Yes, Your Honor. Congress knows less about this than we do. I assure you, I assure you that, and that probably is not the politic thing to say, there aren't three people in Congress. There might be one or two senior staffers and maybe two to four members who have any idea of any of this. That may very well be the case, Your Honor. I won't comment on that. Let me ask you a question so at least I can—I could have this wrong. This is an area when we walk in these kind of things, you've got to be careful when you write these kind of opinions. As I understand it, this safe harbor statute, that doesn't have an enforcement provision in it. It basically says that you go to the common law and you can, which is what was attempted in Sony and others, you can then bring a common law action. But you've got this safe harbor here, and if you do these things here, then you would be outside of this. Is that where we are? That's exactly right, Your Honor. So what—I mean, and we've been hearing all kinds of arguments, but I'm trying to understand is, well, your contention is you're not entitled to safe harbor because they are, in fact, repeat offenders, and you have this quantum of knowledge that's necessary to shield them. Well, it's much more than that. They're not entitled to safe harbor because they fabricated documents. They created an entire sham system to pretend to terminate subscribers. They presented that information in sworn interrogatory answers. They had experts try to whitewash— Let me ask this before you sit down. Do you maintain that a company like COPS has to have a policy in place, irrespective of whether they have knowledge of infringers? If they want to take advantage of the safe harbor, they have to have a policy in place and terminate subscribers in appropriate circumstances. Absolutely. If they don't want to take advantage of the safe harbor, they don't need to do that. Let me ask you a practical question. I just want to finish this up because this is interesting to be on this point. Let me ask you a practical question. So COPS does that. It terminates a person. What's his competitor? Spectrum? Is that a competitor? Spectrum. Pardon me, Your Honor? Spectrum. One or the other. Sure. That person leaves COPS that day, and within a couple of minutes, he gets on Spectrum. Spectrum got to do the same thing or what? If Spectrum wants a safe harbor, it also has to have— You understand my question? Maybe not. If there's a clear infringement, COPS is all right and terminates you. Ten minutes later, he signs up for Spectrum. Does Spectrum have to go to COPS and say, why did you terminate him? No, I don't. No, no, no. So he then just continues on, and then how long is it before he can go back to COPS? Or is he just terminated forever? Well, in this case, Your Honor— I want to know the answer to that question. Well, I'll give it— Or do we know? If you don't know, because that's the problem. That's what I'm trying to understand. What are we dealing with here? Practically, what are we dealing with? Obviously, you're going after COPS. You're going after Spectrum. But what's happening here? Are you ending or is there an end to any of this? If the individual who is the infringer, who's really the problem, is doing it, he's terminated by COPS, that afternoon he signs on Spectrum. He goes six months with Spectrum. Spectrum finally finds out he's won, they terminate him. He comes right back to COPS. Is that a reasonable scenario? I would think that a reasonable subscriber that gets— I want to know, is that a reasonable scenario? No, because I would— So he will not—COPS will not let him back in six months? Well, COPS may let him back in six months. That was their— Then would they be in violation if they did? That was their process here, and if they abided by it, we didn't have a problem with it. Would they be in violation if they did? After six months of not being there with him, and they bring him back in six months, would they be in violation? The law doesn't indicate what the timeframe is, but I don't think that would be unreasonable. The answer is there is no indication they would be. Is that right? The answer is, yeah. If they brought somebody back— So what is this here? What this is is an attempt to try to solve a huge problem. Okay. It's an attempt to try to solve a huge problem. And what you're saying is it's not a perfect solution. It's not. But it is some solution. It is some effort, and that's precisely what Congress envisioned. And all this goes to is whether they're entitled to this safe harbor provision. It doesn't make them liable. All your discussion right now is about safe harbor. You're right. But their actions and their failure to take even the most simple measures to try to curb some of this activity. But on the contrary, to create a moat around these folks. It's not a perfect solution. I understand it's not a perfect one. Let me just say, what if they say, okay, we've got a policy, we're going to terminate you. We terminate you for one week. Have they satisfied safe harbor? Everybody that comes up, you send them notices, all right, we terminate you. Boom, we do it. And they do it. I don't think a week would be enough, Your Honor. Who said so? There's no clear, bright line on this. There's not a mechanical test. Who says so? It's six months. Where do you get six months a year from? But Congress, Your Honor, Congress in the legislative history makes clear. They did exactly what they were supposed to. They inflicted a punishment. They terminated you. One week. But that's what the court found. The court was, what they did here was terminate somebody and immediately reactivate them. There's emails that say DMZ. What is it? Because when they set up a policy like that, that's the next question that's going to come to us, right? Is that long enough? What's that term that you think is going to be sufficient for them to meet the safe harbor requirement? If they implement this policy, maybe not an hour they can terminate him, maybe not a day, but do it a week. What is the term? Or is there no answer? You're telling me there's no answer. No, no. You just said there's no answer. For purposes of termination under safe harbor, their pretend terminations were for six months. I think that would be fine. No, no. This is a real termination. If you end it, he doesn't have it. And we know that terminating, and therein the question started getting into, you terminate this service provider, and it's really fuzzy because you got Cox, but who else does it apply to? Does it apply to all the schools and everybody else who's doing this, allowing it? It really is a muddled situation. It's much more complicated than what is standing before us right now. As Judge Motz indicated, it is not a perfect solution. It's not even a good one. Well, it's the best we've got, Your Honor. Let me ask you this. I'm not sure there's any solution. Is your standard determination as good as it's long enough to get somebody to pay you money? Well, that's Cox's driver. I mean, their driver was. That's not your driver? Your driver is not to collect money here? Our driver is to get these people to stop infringing our copyright. No, no. Or to collect money for having done it or for doing it. Right? No, no. Wait, wait. Now, wait. You didn't send a letter. The letter that you wanted to send didn't say, you are infringing. Don't you ever do it again. I think your letter said, you're infringing. Pay us some money, and we can look beyond it. Didn't it? There was a settlement proposal in the language. There's no need to dance around that. Do you really want to dance around that? Your letter said, Cox, pass this on to these people and those people. And it says, you're infringing. You can go to this website or whatever and click and pay us $20 or $30. If not, you're looking at a $150,000 fine. It was about collecting money. We don't dance around that, do we? It was about collecting money to provide a release to get the infringement to stop. But let me make an important point here. Let me also say this. And Judge Wynn made a very important point. We see what's going on and we understand your argument. What you have here is you have two corporations fighting over money, fighting over money, which may be justified, but the net effect of this battle is going to be up against another policy, which is, I think it is the policy, that people should have access to Internet. They should have an ISP person they can use because a lot of people may infringe. And I guess, I don't know what the fact would be here. My guess is it's the odd person, not the majority of people who have ISP service, just to infringe. You look at the weather. You do all kinds of stuff. Facebook, you do all kinds of things. But the net effect is, and Judge Wynn was getting to it, it affects libraries, it affects other people. I understand you all are fighting. I'm not saying you can't fight. But the bottom line is this question about money and collecting money and who is going to be the heavy hand in saying to the subscriber, pay up. You wanted Cox to do that for you because you wanted money from them. Cox didn't want to do that because Cox wanted money from them, continued service for them. You understand that, but it has broader, broader implications. Your Honor, let me just address the settlement piece because I think it's important. Well, it's in the record. It absolutely is. You haven't misstated anything, have I? No, not at all. But the important point is Cox didn't have to send that letter, but they had to do something. Well, they suggested to you they would, isn't that correct, if you took out the settlement demand? And if they had done it, Your Honor? No, no, no. They say that. That is correct. So in other words, it's not just what you say. They had to do something. They offered to do something, but without your money demand, that didn't suit you. But their offer to do something was to do nothing because they said they would have processed their term, our notice, which meant it would have gone into this massive bucket of filtrations to get to the point where nothing was done. If they had offered to send the notice without the money demand, would you be satisfied? Would you have been satisfied with that? No, because I don't think anything would have been done, Your Honor. You take an extra time to make my point. Because you're relying on the other evidence in the record about what they did do with the notices that they got, not your notices but other notices, right? Yes. Isn't that what you're saying? I'm sorry. Please take your question if you would, Your Honor. Never mind. We've kept you too long. Okay. Why don't I give you just two minutes of uninterrupted time to tell us. No, we can't have that. What you would like to tell us about this case. Do you feel you're up to that right now? I think so. I've been bounced around a little bit, but I'll see what I can do. You're wasting your time. This case, there is not a single case statute rule edict policy that allows Cox to do what they've done in this case, that allows them to ignore all of these notices of infringement, not only from BMG but from a ton of other copyright holders, to build a moat around their subscribers, to forbid copyright holders from even letting their subscribers know they've been detected of infringement. They're misreading Sony, they're misreading Grokster, and they're trying to create a permanent blanket immunity simply because they provide Internet service. They chose to get into the business of providing a service that people use to infringe copyrights, period. We go out and detect the copyright holders engaged in this investigation. We detect it as much as we can. We provide them the results. It's effectively an investigation report. Cox takes it, throws it right in the trash. They do nothing. They enable infringement, which leads to the habitual abusers, which leads to the driver being, when Cox is looking at what to do, do they make more money for us than they cost? That is not proper under contributory infringement liability. The jury instruction was appropriate, and there was ample evidence to support the finding in this case, particularly the finding of willfulness given all of the evidence that's set forth in our papers. If there's any further questions, I'll sit down. We want to thank you very much. We're not allowed to ask them. Right. We're not allowed to ask them now. Thank you. Right this minute. Thank you. Mr. Elkin. May it please the Court. Just a couple of points, if I may, in rebuttal. First, I just want to pick up on the colloquy between Counsel and Judge Wynn related to this material contribution issue. The specific instruction, Instruction 26. Where is the definition? It's not in one of those cases there, so is there any restatement that you can find that? Well, it just says what I was referring to, if I may. It starts out with the words, with certain exceptions, the person is liable, et cetera, et cetera. And the jury did come back and ask the question to provide what is information with regard to what is a material contribution. That was a perfect opportunity for the Court to say, look, where a product like this is capable of substantial non-infringing uses, you can't find culpability unless on generalized knowledge that the product could be used for legitimate purposes. That didn't happen. The jury didn't get that instruction. On the issue of notices, several things. Can we just back up a second? Of course. But your argument ended up with generalized knowledge, not with material contribution, which is the point that Judge Wynn was making. And I didn't really see you featuring the asserted error with the material contribution. Judge, respectfully, I do think both in our opening brief and the reply brief, I don't have the pages memorized. It's your point. The instruction that you offered was correct as a matter of law? We believe it was correct as a matter of law. I'm talking about the material contribution. On the material contribution. But regardless, if I may say this, the jury obviously was confused. And the reason for it— But you're obviously an experienced lawyer. You know many times a jury comes back and wants instructions. And the district court says, and I've given you all the instructions I'm going to give you. That's it.  But this particular instruction, Your Honor, instruction 26, starts out with certain exceptions. This comes out of the O'Malley standard patent jury instructions. The next instruction basically would have said where a product is capable of substantial non-infringing uses. It was right there. The judge elected not to provide that instruction. Your argument with respect to—I thought your principal argument with respect to jury instruction numbers 26 was whether you need actual knowledge or not. That is correct. Well, there you go. But we—Your Honor, we specifically said both before summary judgment, after summary judgment, at the trial, and the J-Mall, and at the charging conference, that the jury should have been given a Sony instruction, any Sony instruction. And the district court refused to provide it. We believe if that would have happened, the only way, frankly, that there could have been liability is under a Grokster analysis where there was a clear expression, culpable conduct, affirmative acts. That wasn't pled. That were proceeded on. With regard to the notices issue, if I could just address that very briefly. The reason why they were not accepted is because the way they were sent, they were abusive. They were not accurate. They were false. And they had this language that Cox believed was extortionate. On one day alone, there was testimony at trial where they had stuffed the mailbox with some 24,000 notices that would have crippled the system. There was no notice that Wright's Corp ever had that was received and reviewed that contained any BMG infringements at all. Was there any policy that applied to people you knew were repeat infringers, adjudicated infringers? Did you have such a policy? Yes, there was a policy. Different than this one? Different than, the policy changed, you know, after post-fall 2012. It changed from nothing to what? Basically, it was a 13-step process. And at the end, you would be terminated for six months. And in fact, there was evidence in the record before you where during this period of time, Cox terminated 22 individuals. I would say, if I may, that the statute doesn't simply say, repeat, terminate, repeat infringers, full stop. It says terminate, repeat infringers in appropriate circumstances. And the issue that we have that I wanted to sort of make in this argument. No, but I ask that question because this is how I looked at that safe harbor. I thought the argument went only to what is a repeat infringer. But I understood the argument just made counter to you is the system was a sham no matter what. So, in other words, I think I heard him say this adopted and reasonably implemented a policy that provides for termination in appropriate circumstances. I think they say you don't even qualify for that because there was no such system the way you went about it. And so, that's why I ask you if there was something other than the one we've been talking about. For somebody who's clear to Cox is whatever definition you want to use, adjudicated infringer. Was there a different system for them or were those, is there evidence in the, was there a different system for an adjudicated infringer or not? The system did not make any reference to. The answer is no. The answer is no. Okay. So, then, do you have any evidence? Did you have any system to deal with and somebody that you knew was an infringer that you actually used? Yes. For the post-fall 2012 period, it was used and if they got to the 13th step, they were terminated. And there's evidence that 22 terminations took place during that period. What made those people infringers in your definition and people who would be subject to the original notice not infringers? In the record. There was no knowledge. It was simply a question of receiving notifications, processing them through the gradual steps. The allegations were. What made them an infringer to your satisfaction, those 22 people? It wasn't a statutory definition. It was basically a simple question of we received the notice. This is the second time. In other words. They're going to get a warning. You got enough notices. What made somebody, by your definition, made this a better way to ask it. Does the record reflect there was anybody, you think infringers should be what, an adjudicated infringer? That's correct. Does the record indicate that there was anybody who was terminated who, in fact, was an adjudicated infringer? There is no evidence in the record that anyone was an adjudicated infringer. Even though these 12, 13, whatever they are, people you took out, they, in fact, were not adjudicated infringers either. Exactly. It was simply a process of a determination in Cox's discretion. You know what that suggests? That suggests that Cox had a definition for a repeat infringer that was short of adjudicated. They certainly had a process, for sure. No definition. They, what happened was they, the process. No, I understand what happened. And so that's what they did. And we believe that. So you're arguing for the safe harbor provision. There has to be a standard tougher than Cox used. That Cox did something he didn't have to do because there were no infringers in this case. Cox did exactly. In the definition of safe harbor. You're right. Is that correct? Cox actually did something he didn't have to do. Would that be correct? It would be correct. And if I could just amplify for one sentence on that. They had a system where they encouraged receiving notifications. They processed hundreds of thousands of notifications. I know all that. The only other company that had provided what Cox believed was extortionate language as well, Cox had asked them to revise their notices. And once they did it, they accepted all of those notices. I know counsel had made reference to some dashboard and some other communications. The evidence in the record is that none of that was accessed prior to the time of, after the time when notifications from Rights Corps featured any BMG infringing work. We believe that's the standard with regard to contributory liability. The last point I'll make, if I may, is that this court in COSTAR, in Section 512L of the DMCA, makes clear that if we are unable for some reason to succeed in getting safe harbor, that shouldn't have any bearing on whether or not there's liability for contributory liability infringement. I think there's an urging, at least in the briefs that BMG submitted, that to say, hey, look, you lose your Sony bar unless you qualify for the DMCA. That's simply not the case. Thank you very much. Thank you. I think you have an opportunity for a minute left to have a rebuttal. Not quite. You must have filed cross appeals. We did, but I'll cede my time, Your Honor. Thank you so much. Thank you very much. We will come down and greet the lawyers and then take a brief recess. This honorable court will take a brief recess.
judges: Diana Gribbon Motz, Dennis W. Shedd, James A. Wynn Jr.